FREDERIC H. EVERLY, Appellant, *v.* CHICAGO POLICE BOARD *et al.*, Appellees.

First District (4th Division)   No. 82—2378

Opinion filed November 23, 1983.

James L. Pittman & Associates, of Chicago (James L. Pittman and Peter J. Van Houten, of counsel), for appellant.

James D. Montgomery, Acting Corporation Counsel, of Chicago (Jerome A. Siegan and Robert J. Dargis, Assistant Corporation Counsel, of counsel), for appellees.

JUSTICE JOHNSON delivered the opinion of the court:

Appellant, Frederic H. Everly, filed a complaint for administrative review of the Chicago Police Board (Board) decision to discharge him from the police department. The circuit court confirmed the decision of the Board. Everly raises the following issues for review: (1) whether the findings and decision of the Board were against the man-

ifest weight of the evidence; (2) whether his due process right to a fair and impartial hearing was violated by the destruction of material evidence; (3) whether the Board proceedings should have been dismissed based upon conflict of interest of the corporation counsel; (4) whether police department rules 2 and 38 violate due process as void for vagueness; (5) whether the actions taken by the Board constitute a denial of equal protection; and (6) whether his acquittal of the criminal charges filed against him mandates dismissal of the police Board proceedings. We affirm.

On October 20, 1977, Tyrone Neal was shot during a police stop. Everly, a Chicago policeman, was charged with involuntary manslaughter but was acquitted after a jury trial. The transcript of the criminal proceedings was the only evidence submitted at the disciplinary hearing in which Everly was charged with misconduct.

Testimony at the criminal trial established that Isaac Coulter, a Chicago policeman, was working with his partner, Frederic Everly, on October 20, 1977. They drove to 64th and Woodlawn Avenue, in Chicago, and talked to Michael Griggs and Sharon Hodges. Griggs had been beaten and robbed by four or five persons. One of his assailants had worn orange clothes, another was fat, and a third was thin or of medium build. The police drove Griggs and Hodges around to see whether they could find the offenders. At 63rd and Greenwood Avenue, the officers saw three young men, each of whom was about 5 feet 6 inches in height and weighed about 145 pounds. None of the individuals wore orange clothing. The officers told the suspects to stop. They lined up against the wall and Coulter frisked them. Everly was 1 or 1½ feet behind Coulter. Coulter did not know whether Everly had his gun drawn. After searching all three suspects and finding no weapons, Coulter went back to the police car to see whether Griggs could identify any of the suspects. He heard a shot, then turned around. Coulter did not see a weapon in Everly's hands. One of the suspects, Tyrone Neal, slowly fell to the ground.

Reginald Nunley testified that on the evening of October 20, 1977, he was on his way to a boy's club when he met 14-year-old Tyrone Neal and Andre Holiday. When they were in the vicinity of 63rd and Greenwood, a police car approached. Officer Everly, who had been driving and who had a gun in his hand, told them to put their hands against the wall. The suspects faced the wall spread-eagled with their hands up. Coulter searched Holiday, then Nunley, then Neal. He did not remove anything from the suspects. Everly stood behind Neal. After the search, Everly asked for identification. He said he would blow the head off anyone who did not have identification. Holiday gave Ev-

erly a bus card; Nunley gave him a driver's permit. Neal said he did not have any identification and turned slightly to his left. Everly raised his hand from his waist to the back of Neal's head. Everly fired and Neal fell. On cross-examination, defense counsel impeached Nunley with a prior burglary conviction.

Andre Holiday, 18 years old, saw Neal on October 20, 1977, at a boy's club. After they left the club, they met Nunley. At 63rd and Greenwood, a police car stopped and two uniformed officers got out of the car. One officer told them to stand against the wall. Coulter searched them, then Everly asked for identification. Neal said he had no identification and turned his head. His hands were over his head and on the wall. Holiday heard a gun fire and Neal fell.

Elvira Irons testified that on October 20, 1977, she lived at 6318 South Greenwood Avenue in a third-floor apartment. At about 8:30 p.m., she was sitting by her window and looking toward 63rd Street. She saw three youths on the corner. A police car approached and the youths began walking. When two officers got out of the car, the youths went to the side of a wall. The driver of the car had a gun in his hand. The other officer searched the youths and then walked toward the squad car. The driver stepped back; the third youth tilted his head slightly to the left. Irons heard the gun fire, and the youth fell.

Gregory Dune testified that on October 20, 1977, he was employed by an ambulance company. At about 7:30 p.m., he received a call. As the ambulance turned at 63rd and Greenwood, he observed three or four youths lined up against the wall and two uniformed policemen. One was searching the youths while the other held a gun to the head of one of the young men. As the ambulance proceeded down Greenwood Avenue, Dune heard a gunshot. The ambulance returned to the scene, and Dune observed one of the young men lying on the ground. They put him in the ambulance and took him to the hospital. On cross-examination, defense counsel impeached Dune with several prior convictions.

John York, a Chicago policeman, testified that on October 24, 1977, he inventoried a gun and five cartridges. They were destroyed after two months—December 20, 1977. The owner was notified that unless he picked up his property within 30 days, it would be disposed of.

Lamar Blount, a Chicago policeman, received a .38-caliber revolver from Everly at about 10:30 p.m. on October 20, 1977, and inventoried it. He told Everly that he could get his weapon back within 30 days.

Michael Griggs testified that on October 20, 1977, he was robbed and beaten near 61st and University Avenue by two men, one of whom was tall and thin and wore an orange jacket and pants; the other was short and flabby. After the incident, Griggs gave a description of the offenders to Everly. Griggs and Sharon Hodges, his common law wife, rode around the neighborhood in the police car with Everly and Coulter. On Greenwood Avenue, they saw three youths who did not fit the description of Grigg's assailants. Everly asked Griggs whether the three youths were the offenders; Griggs said, "No." Everly said the youths looked suspicious anyway and he was going to "check them out."

Everly jumped out of the car with his revolver drawn. The youths placed their hands on the wall. While Griggs talked with Hodges, he heard a gunshot. Everly had a gun in his hand and a youth fell to the ground. Everly approached the squad car and asked Griggs if he would testify that one of the young men had robbed him. Later that evening, Griggs gave a statement at the police station regarding the shooting. When Everly drove Griggs home, he told Griggs he should not have repeated what he (Everly) had said. On cross-examination, defense counsel impeached Griggs with prior convictions.

Sharon Hodges testified that on October 20, 1977, she and Griggs lived at 6400 South Woodlawn Avenue. Griggs came home around 8:30 p.m. He had been beaten. The police were called and they arrived within a few minutes. Griggs did not want to go to the hospital but agreed to go in the police car to see whether they could find the offenders. After the officer stopped the three youths at 63rd and Greenwood, Hodges heard a gunshot. Everly put his gun in its holster and asked Griggs if he would say that the youths had robbed him. When Everly drove them home later that evening, he told Griggs that he did not have to repeat the statement he (Everly) made immediately after the shooting.

Edward Ganz, a neurosurgeon, was qualified as an expert. On October 20, 1977, he was on call at Billings Hospital, in Chicago. He examined Neal, who was in a coma and had two gunshot wounds in the back of his head. Neal died on November 2, 1977, as a result of irreversible brain damage.

Donald Smith, a Chicago policeman, was qualified as a firearms expert. He examined Everly's police service revolver on October 21, 1977, and performed certain tests. In Smith's opinion, the mechanical safeties were functioning properly and the weapon was in good operating condition.

Robert Stein, chief medical examiner for Cook County, performed

an autopsy on Tyrone Neal on November 2, 1977. The cause of death was a bullet wound to the head.

Frederic Everly testified in his own defense. He was employed by the Chicago police department on February 19, 1973, as a patrolman. Shortly thereafter, he bought his .38-caliber Smith and Wesson revolver, which had to be repaired.

At about 8 p.m. on October 20, 1977, Everly received a message of a man stabbed at 6400 South Woodlawn. He interviewed Michael Griggs at the latter's apartment and observed that he had been beaten rather than stabbed. Griggs wanted to look for the offenders because they had taken all of his money. Everly and his partner, Isaac Coulter, Griggs and Sharon Hodges toured the neighborhood in a police car. As the car approached 63rd and Greenwood, Everly observed three youths who were walking north. When they saw him, they turned around and began running. Everly told Griggs, "These might be the ones." Griggs nodded. When Everly jumped out of the car and shouted, "Police," the youths stopped. Everly told them to line up against the wall. Coulter patted down the suspects while Everly "covered" Coulter. Everly was four to six feet away from the suspects. While Coulter frisked the third suspect, Tyrone Neal, Everly asked the other two suspects for identification. Everly was looking at their identification and covering Coulter. Neal said he had no identification. Neal suddenly moved his hand and head. Everly turned toward Neal and his revolver discharged. Everly dropped the gun, threw up his hand and said, "Oh, my God."

Everly never intended to fire his weapon, and he did not point it at Neal. He never asked Griggs to do him a favor. Later that evening, Everly turned in his revolver and cartridges which he never saw again. Everly claimed that before he stopped the three suspects, Griggs never said they were not his assailants.

On cross-examination, Everly could not recall the description of the offenders that Griggs had given. He drew his revolver when he got out of the car, but he did not cock it and never saw it cocked. But, in his firearms usage report dated October 21, 1977, he wrote that his weapon was "apparently cocked." At trial, Everly stated that his partner was not in his view immediately before the shooting, but in a statement made on October 21, 1977, he said that Coulter was "crossing over changing positions to get to the third person, that's when the shooting took place." It was only after the incident that Griggs told Everly that the suspects were not his assailants.

At the close of his case, Everly made an offer of proof that Roy Swanson, a Chicago policeman, would testify that he received an un-

dated letter from Smith and Wesson recommending the removal of the trigger stop in revolvers of the type Everly had owned.

Although Everly was acquitted of criminal charges, the Board recommended his discharge on the grounds that he violated police rule 2 barring "conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department" and rule 38 which bars "[u]nlawful or unnecessary use or display of a weapon." On September 12, 1982, the trial court confirmed the Board's findings and decision. Everly appeals.

The first issue raised by Everly is whether the findings and decision of the Board are against the manifest weight of the evidence. Everly argues at length that his conduct conformed to good police procedure and that he was not responsible for the death of Tyrone Neal. He contends that the only support in the record to sustain the findings of the Board consists of the totally discredited and impeached testimony of convicted felons and purported eyewitnesses who never really observed what happened; that no competent evidence established that he violated departmental regulations or departed from correct police procedures; that nothing in the record suggested that he unlawfully displayed his revolver; that evidence in the record raised doubts about the proper functioning of his weapon; that no legally competent evidence established that a bullet from his revolver struck Neal; that gaps in the chain of custody cast serious doubt as to whose revolver was inventoried; and that Neal's death was proximately caused by negligent medical care.

■ We reject Everly's arguments. The decision of the Board should not be set aside by a reviewing court unless the opposite conclusion is clearly evident. The reviewing court determines only whether there is evidence which fairly tends to support the Board's decision. In reviewing findings of an administrative agency, courts can only set aside findings if they are against the manifest weight of the evidence. (*Davenport v. Board of Fire & Police Commissioners* (1972), 2 Ill. App. 3d 864, 868, 278 N.E.2d 212, 215.) In the instant case, there was sufficient evidence to support the Board's findings that Everly's conduct discredited the police department, that he unnecessarily displayed his weapon, and that he should therefore be discharged.

The three suspects stopped by Everly and his partner did not conform to the descriptions of the offenders given by Michael Griggs. The youths offered no resistance and they were unarmed. Although Everly denied at trial that he cocked his weapon, in his firearms usage report, written shortly after the incident, he wrote that his

weapon was "apparently cocked." After the shooting, a firearms expert examined Everly's revolver and found it in good operating condition. In our opinion, the Board's findings and decision are not against the manifest weight of the evidence.

Everly next argues that his due process right to a fair and impartial hearing was violated by the wilful destruction of his revolver on December 20, 1977, the day before he was suspended from the police force. Everly contends that he never had the opportunity to marshall facts in support of his most valuable defense, namely, that his revolver malfunctioned.

■■ Again, we reject Everly's argument. He does not convincingly explain how the failure to introduce the revolver into evidence materially prejudiced his defense. At trial, defense counsel cross-examined the expert witness who testified that the weapon was in good operating condition. Everly testified that shortly after he purchased the weapon it had to be repaired and that he never intentionally cocked the revolver. He made an offer of proof that the gun manufacturer had recalled revolvers of the type he owned. Thus, the Board was aware of Everly's defense that the handgun malfunctioned. Further, the record reveals that the weapon was destroyed in the course of routine police procedure and before Everly was suspended from the police force. In our opinion, Everly's due process right to a fair and impartial hearing was not violated by the destruction of his weapon.

Everly argues that the Board proceedings should have been dismissed because the corporation for the city of Chicago had the responsibility of defending him in the civil suit brought by the father of Tyrone Neal, yet prosecuted him in proceedings before the Board. He urges that the mere opportunity that confidences reposed in an attorney could prejudice the client in subsequent proceedings would impinge on the fair and impartial requirement of the due process clause.

■■ Everly's argument has no merit. He has demonstrated no potential or actual conflict of interest. The evidence submitted to the Board consisted solely of the transcript of the criminal trial in which Everly was represented by private counsel. Therefore, we hold that Everly established no conflict of interest by the corporation counsel.

Next, Everly argues that police rules 2 and 38 are violative of due process as void for vagueness because they do not intelligently apprise those affected by them as to what conduct is proscribed. Accordingly to Everly, the rules vest arbitrary powers in the Board and have a potential chilling effect on permissible behavior.

Everly was discharged from the Chicago police department for violating rule 2 which forbids "[a]ny action or conduct which impedes

the Department's efforts to achieve its policy and goals or brings discredit upon the Department" and rule 38 which forbids "[u]nlawful or unnecessary use or display of a weapon."

■ In our opinion, the meaning of rule 38 is plain and not vague. Rule 2 is similar to a provision upheld by the United States Supreme Court in *Arnett v. Kennedy* (1974), 416 U.S. 134, 40 L. Ed. 2d 15, 94 S. Ct. 1633. In *Arnett*, a provision authorizing removal of Federal civil service employees "for such cause as will promote the efficiency of the service" was ruled not void for vagueness even though it did not spell out in detail the conduct that is proscribed. In the instant case, it would be difficult for the Board to anticipate every type of behavior that would either impede police department policy or discredit the department. (*Cf. People ex rel. Fahner v. Testa* (1983), 112 Ill. App. 3d 834, 837, 445 N.E.2d 1249, 1252, terms inherently not susceptible to precise definition.) We hold that police regulations 2 and 38 are not void for vagueness.

Everly argues that the actions taken by the Board against him constitute a denial of equal protection. He claims that white police officers involved in shooting incidents were not subjected to criminal or disciplinary proceedings; that black Chicago policemen have been charged and punished disproportionately for infractions; and that the Board refused to provide him with records regarding other police shooting incidents. Everly urges that in denying his motion to produce records and his motion to dismiss based on denial of equal protection, the Board committed prejudicial and reversible error.

■ Again, we reject Everly's contention. We have examined the record and find only a bare allegation, and no evidence, that the actions of the Board were racially motivated. (*Cf. Kurek v. Kavanagh, Scully, Sudow, White & Frederick* (1977), 50 Ill. App. 3d 1033, 1038, 365 N.E.2d 1191, 1195, mere filing of lawsuit does not establish cause of action.) We conclude that the Board did not deny Everly equal protection.

Finally, Everly argues that because he was found not guilty in the criminal trial for the involuntary manslaughter of Tyrone Neal, *Caliendo v. Goodrich* (1975), 34 Ill. App. 3d 1072, 340 N.E.2d 560, mandates that the Board proceedings be dismissed.

■ Everly interprets *Caliendo* too broadly. In that case, the appellate court reversed the Chicago police board's decision to discharge an officer because the record did not support the board's conclusion that cause existed for the officer's discharge. (*Caliendo v. Goodrich* (1975), 34 Ill. App. 3d 1072, 1076, 340 N.E.2d 560.) The court did not reverse because the police officer was found not guilty of criminal

charges. In the instant case, there was sufficient evidence to support the decision of the Board. Further, a finding of not guilty in a criminal proceeding does not preclude a civil proceeding based on the same charges since there is a different standard of proof in each proceeding. (*Shallow v. Police Board* (1981), 95 Ill. App. 3d 901, 908, 420 N.E.2d 618, 624.) We conclude that Everly's acquittal of the criminal charges filed against him does not require dismissal of the Board proceedings.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

ROMITI, P.J., and LINN, J., concur.