LAWRENCE SIMONIS, Plaintiff-Appellant, v. THE COUNTRYSIDE FIRE PROTECTION DISTRICT *et al.*, Defendants-Appellees.

Second District   No. 2—87—1061

Opinion filed August 4, 1988.—Rehearing denied September 15, 1988.

Thomas F. McGuire, of Thomas F. McGuire & Associates, Ltd., of Long Grove, for appellant.

Paul S. Chervin and David A. DeRose, both of Wildman, Harrold, Allen & Dixon, of Waukegan, for appellees.

JUSTICE WOODWARD delivered the opinion of the court:

The plaintiff, Lawrence Simonis, sought administrative review of a decision of the Board of Trustees of the Countryside Fire Protection District (Board) which found that he failed to perform his duty and suspended him for five duty days. Plaintiff appeals from an order of the trial court which affirmed the Board's decision. On appeal, plaintiff contends that (1) the trial court did not have the authority to review his complaint under a common law writ of *certiorari*; (2) he was denied due process at his disciplinary hearing; (3) his disciplinary hearing was conducted in violation of the Open Meetings Act (Ill. Rev. Stat. 1987, ch. 102, par. 41 *et seq.*); (4) the Board and fire chief failed to follow the fire department's disciplinary procedures; and (5) the trial court's decision was against the manifest weight of the evidence.

On January 10, 1987, at 5:15 a.m., station two of the Countryside Fire Protection District received a call for an ambulance. The call indicated that a person had suffered a broken leg in a snowmobile accident. After attempting to wake up plaintiff, fire fighters Tim Rick and Ken Arnswald responded to the scene. Plaintiff failed to wake up and respond to the call.

According to the fire district's normal operating procedures, upon receipt of a typical emergency call, two fire fighters are dispatched to the scene while a third fire fighter monitors the radio. The fire fighter who monitors the radio is responsible for recording the ambulance's departure and arrival times and dispatching additional manpower if necessary. When a call is received by one of the fire district's two stations, the other station is also required to monitor the radio until the station which received the call acknowledges that it has taken over monitoring the radio. Once a fire fighter team has been dispatched on a call, other on-call fire fighters receive a telephonic page instructing them to come into the station.

On March 2, 1987, the Board held a formal hearing to determine whether plaintiff failed to perform his duty. Fire fighters Rick and Arnswald testified that they, along with plaintiff, had worked a full duty day which started at 8 a.m. on January 9 and ended at 8 a.m. on January 10. Around midnight, Arnswald and plaintiff went to sleep in the bunk room; Rick went to the bunk room sometime later that morning. At 5:15 a.m., both Rick and Arnswald awoke to a pager tone which came in over the station's radio. Following the tone, there was a verbal message indicating the nature and location of the call. As he was getting dressed, Rick stated that he told plaintiff three times to get out of bed and then turned on the lights. Rick proceeded to get his equipment and place it in the ambulance. Arnswald testified

that he called to plaintiff in an above normal tone of voice three times yet plaintiff failed to get up. Rick and Arnswald testified that they left the station and were unable to raise plaintiff on the radio. Neither of them went to Simonis' bed and attempted to shake him from his sleeping condition.

Captain Spiegel testified that on January 10, 1987, at 5:15 a.m., he received a message on his pager calling him into station two. Upon arriving at the station, Spiegel notified another on-call fire fighter that he was there and began shoveling snow. At approximately 5:30 a.m., when he was done shoveling snow, Spiegel entered the bunk room and saw plaintiff getting out of bed. Spiegel asked what had happened, at which point plaintiff repeated the same question to Spiegel. Upon being told that there was a call in progress, plaintiff indicated that he was unaware of the call. Spiegel then instructed plaintiff to get dressed and help shovel snow.

Plaintiff testified that on January 8, 1987, while he was on call, he responded to a pager call which lasted until midnight. During his normal duty shift, plaintiff stated that there were no calls. Plaintiff testified that he did not have any sleeping disorders and was not suffering from any physical ailments. Plaintiff admitted that he did not wake up when the 5:15 a.m. call was received. Plaintiff further stated that he was embarrassed when he learned from Spiegel that there was a call in progress. Plaintiff testified that he had never before slept through a call. Plaintiff had been given numerous citations and awards commending his work as a fire fighter.

The Board found that plaintiff had failed to perform his duty and suspended him for five duty days. On April 8, 1987, pursuant to section 3—101 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 3—101), plaintiff filed a complaint in the trial court. After deciding that it had no jurisdiction to consider plaintiff's complaint under section 3—101, the trial court reviewed the complaint as a common law writ of *certiorari*. The trial court found that the Board's decision was not against the manifest weight of the evidence, and plaintiff appeals from that finding.

■ On appeal, plaintiff first contends that the trial court improperly reviewed his complaint as a common law writ of *certiorari* instead of entertaining it under the Administrative Review Act (Ill. Rev. Stat. 1987, ch. 110, par. 3—101 *et seq.*). We find no merit to plaintiff's contention.

In the relevant part, section 16.01 of "An Act relating to the State Fire Marshall" states:

"Any fire protection district having a fire department of which

3 or more, but not all members, are full time, paid members, may, at the option of the fire protection district board of trustees, elect to come under the provisions of Sections 16.01 to 16.18, inclusive, and shall be subject to the provisions of Section 16.13 relating to removal or discharge of fire department personnel." (Ill. Rev. Stat. 1985, ch. 127½, par. 37.01.)

According to section 16.01, the Board had the option of deciding whether it should adopt section 16.13's procedures for the removal or discharge of fire department personnel. Under section 16.13, the removal or discharge of fire department personnel is subject to the provisions of the Administrative Review Act. See Ill. Rev. Stat. 1987, ch. 127½, par. 37.13.

As the record indicates, the Board has not elected to come under the provisions of the Act, and, therefore, plaintiff's suspension was not subject to the provisions of the Administrative Review Act. In any event, our supreme court has held that "the substantial differences that at one time existed between common law and statutory *certiorari* have been all but obliterated." *Smith v. Department of Public Aid* (1977), 67 Ill. 2d 529, 541; see also *Maddox v. Williamson County Board of Commissioners* (1985), 131 Ill. App. 3d 816, 822; *Batley v. Kendall County Sheriff's Department Merit Comm'n* (1981), 99 Ill. App. 3d 622, 626.

■ Plaintiff next contends that he was denied due process at his disciplinary hearing when he was not given the opportunity to question Board member Wolowic and the Board's attorney, Paul Chervin, about alleged conflicts of interest.

Due process guarantees a person a fair and impartial tribunal in an administrative proceeding. (*Collura v. Board of Police Commissioners* (1986), 113 Ill. 2d 361, 369; *Jones v. Board of Fire & Police Commissioners* (1984), 127 Ill. App. 3d 793, 804.) Due process, however, is a term that negates any concept of inflexible procedures which can be universally applied to every imaginable situation. (*Collura*, 113 Ill. 2d at 369.) Whether a recusal is required depends on the facts of each case, and the mere possibility of prejudice is insufficient to demonstrate that a Board, or one of its members, is biased. *Collura*, 113 Ill. 2d at 370.

In *Everly v. Chicago Police Board* (1983), 119 Ill. App. 3d 631, Everly, a police officer, shot a youth suspected of committing a robbery. The city's corporation counsel defended Everly at his civil trial and then prosecuted him in proceedings before the police disciplinary board. Everly contended that he was denied due process at his disciplinary hearing because the corporation counsel, having been exposed

to Everly's confidences at his civil trial, could have prejudicially used those confidences against him. In rejecting Everly's contention, the court determined that Everly failed to demonstrate any potential or actual conflict of interest. *Everly*, 119 Ill. App. 3d at 638.

Like the court in *Everly*, we conclude that plaintiff has not demonstrated any potential or actual conflict of interest. While plaintiff, in the proceedings below and in his brief on appeal, alleges an improper relationship between Board member Wolowic and the fire chief, the record is devoid of any evidence tending to support that allegation. Plaintiff has pointed to neither improper statements, evidentiary rulings, nor other evidence indicating that Wolowic was biased against him, had interfered with plaintiff's presentation of his case, or had a personal interest in the outcome of the litigation. (See *Kosoglad v. Porcelli* (1985), 132 Ill. App. 3d 1081, 1090.) In our view, plaintiff's bare allegations, without more, do not support the existence of a conflict of interest between Wolowic and the fire chief. Furthermore, plaintiff's allegation that there was an improper relationship between Chervin and the fire chief's attorney is equally unpersuasive for the aforementioned reasons.

Plaintiff also claims that he was denied due process because Board member Aspegren made a comment indicating Aspegren's predisposition toward plaintiff's guilt. Specifically, Aspegren stated, "I was hoping you'd plead guilty and we could wrap the thing up." We believe that plaintiff has taken Aspegren's comment out of context. Aspegren's comment was made in response to a statement uttered by plaintiff's attorney which expressed the hope that the fire chief would not prolong the proceedings and withdraw the charges against plaintiff. After reviewing the entire transcript of the proceedings, we conclude that Aspegren's comment appears to express his desire that the proceedings end at that point, not that he was predisposed toward plaintiff's guilt. Therefore, plaintiff was not denied due process at his disciplinary hearing.

■ Plaintiff next contends that his disciplinary hearing was conducted in violation of the Open Meetings Act (Ill. Rev. Stat. 1987, ch. 102, par. 41 *et seq.*) because the Board and the Board's attorney deliberated the evidence presented at the hearing in a nonpublic session. We disagree.

Section 1 of the Open Meetings Act states:

"It is the public policy of this State that the public commissions, committees, boards and councils and the other public agencies in this State exist to aid in the conduct of the people's business. It is the intent of this Act that their actions be taken

openly and that their deliberations be conducted openly." (Ill. Rev. Stat. 1987, ch. 102, par. 41.)

Section 2 states, in part:

"This Section does not prevent any body covered by this Act from holding closed meetings to consider information regarding appointment, employment or dismissal of an employee or officer or to hear testimony on a complaint lodged against an employee or officer to determine its validity." Ill. Rev. Stat. 1987, ch. 102, par. 42.

It is clear that the Act allows a public body to consider disciplinary matters in a closed session so long as its final action is taken at an open meeting. (See *Kosoglad*, 132 Ill. App. 3d at 1092.) Here, the Board held a closed session to consider the evidence which the parties presented and rendered its decision at an open meeting. Therefore, we conclude that the Board did not violate the Act.

■ In his next contention, plaintiff argues that because the fire chief failed to follow disciplinary procedures adopted by the department, his suspension was improper. In support of his position, plaintiff cites to a document entitled "Disciplinary Action Delivery System" (disciplinary statement) which, in the relevant part, states:

"The form on the accompanying page shall be utilizes [*sic*] by the ranking Officers of the Countryside Fire Department when a subordinate member acts in conflict with the rules, regulations, standards, or policies set forth by the administration.

1st Notice *** so marked, even though recorded in writing, shall be considered a verbal warning, following a specific occurance [*sic*]. This notice shall be kept on file and apart from the offender's permanent file.

2nd Notice *** so marked, shall be issued upon actions similar to the prior occurance [*sic*]. It shall be filed as a written reprimand and attached to the offender's permanent file.

If an action presents itself as *very serious*, a written reprimand may be issued on a first occurence [*sic*], without a verbal notice. This may only be done with the approval of the Chief or Deputy." (Emphasis in original.)

Based on the disciplinary statement, plaintiff concludes that the fire chief's act of filing formal charges before delivering a written reprimand violated the department's disciplinary procedures.

We believe that plaintiff has misinterpreted the disciplinary statement. The disciplinary statement is a directive to ranking officers instructing them on the department's procedure for executing a reprimand, not a description of the procedures to be followed when filing a

formal charge. The record does not contain any references to departmental procedures for filing a formal charge. Furthermore, the disciplinary statement does not require a ranking officer to reprimand an employee before instituting formal charges. Consequently, we find no merit to plaintiff's contention that the fire chief failed to follow the department's disciplinary procedures.

■ Finally, plaintiff contends that the Board should not have suspended him for five duty days because his failure to wake up and respond to a call was neither intentional nor a substantial shortcoming in the performance of his duty.

Our function on review is to determine whether the Board's factual findings provide a sufficient basis for its conclusion that cause for suspension existed. (See *Crittenden v. Board of Fire & Police Commissioners* (1985), 139 Ill. App. 3d 154, 161-62; *Carrigan v. Board of Fire & Police Commissioners* (1984), 121 Ill. App. 3d 303, 308.) An administrative tribunal's finding of cause for suspension shall be overturned only if it is arbitrary, unreasonable, or unrelated to the requirements of the service. (See *Crittenden,* 139 Ill. App. 3d at 162; *Carrigan,* 121 Ill. App. 3d at 310.) Cause for suspension exists where the findings support some substantial shortcoming that would render the plaintiff's continued employment detrimental to the discipline and efficiency of the department. See *Crittenden,* 139 Ill. App. 3d at 162.

Plaintiff testified as an adverse witness. He had been employed full time by the district since 1976. Fire fighters for the district worked 24-hour shifts and then were off 48 hours. He was the supervisor on the shift in question which started at 8 a.m. on January 9, 1986, and was to end at 8 a.m. on January 10, 1986. The shift involved an unusual amount of physical activity which included snow shoveling, cleaning, and rebedding fire trucks. He went to sleep in the fire station's bunk room at about 1 a.m. on the 10th. At 5:15 a.m., a call came through to the station regarding a snowmobile accident. Plaintiff, who described himself as a heavy sleeper, never heard the signal and slept through it. He awoke "in a cold sweat" a number of minutes later.

Plaintiff further testified that fire fighters Rick and Arnswald awoke and responded to the call. Under ordinary circumstances, with Rick and Arnswald responding to the call, plaintiff would have stayed at the station to monitor the radio. When Rick and Arnswald arrived back at the fire station, they talked to plaintiff. Arnswald said that he was groggy when he awoke and that he did not pay much attention to plaintiff other than calling to him to get up several times. Arnswald could not explain why he did not do more to wake plaintiff up, *e.g.,*

pulling off his covers or kicking the bed. Plaintiff asked Rick why more hadn't been done to wake plaintiff up. Rick thought he was up, and Arnswald indicated to Rick that he thought plaintiff was awake. Neither fire fighter realized plaintiff was not up until they were going to the accident scene and plaintiff was not monitoring the radio.

Plaintiff stated in his 10 years of service, he had worked at least 750 24-hour shifts. He had never slept through a call prior to this incident. Further, he testified that similar situations of fire fighters not awakening for calls were not rare occurrences but had happened to a number of other fire fighters.

Fire fighter Timothy Rick testified that he was working the 24-hour shift with Arnswald and plaintiff. He was awakened at 5:15 a.m. on January 10 by the sound of his paging device. As he proceeded to get dressed, Rick noticed that plaintiff was still asleep. He called to plaintiff saying, "Larry, we have a call." His tone of voice was louder than his normal speaking voice, but he was not yelling. Rick noted that plaintiff did not respond to this and called to him a second time. Plaintiff moaned and rolled over. Rick at first thought plaintiff was getting up but, in retrospect, realized that what he saw was an involuntary response. Rick called to plaintiff a third time and then headed out the door, turning on the bunk room lights. At that point, he assumed plaintiff was up.

On cross-examination, Rick stated that all fire fighters, on occasion, are difficult to arouse from sleep. To Rick's knowledge, plaintiff got up for all calls and did not require any unusual measures to be awakened. Rick admitted that he wrote a memo dated January 22, 1986, to the district's fire chief which read in part: "I believe Ken (Arnswald) and I should have made a physical attempt to wake up Larry and made sure he was up before we left the station."

Fire fighter Ken Arnswald testified to the following. He was working the relevant 24-hour shift with plaintiff and fire fighter Rick. At 5:15 a.m., he responded to the tone of his paging device. Arnswald noticed plaintiff was still in bed and called out, "Larry, we have a call." Arnswald did not yell but used a voice that was louder than his normal speaking voice.

Plaintiff made an incoherent response to this call. Arnswald called out two more times and received no further response. The bunk room lights were turned on as Rick and he dressed for the call. Arnswald left the bunk room area with plaintiff still in it.

Captain James Spiegel testified that he was at home when he received the relevant call on his pager. He arrived at the fire station at approximately 5:25 a.m. Entering the bunk room several minutes

later, he saw plaintiff getting out of bed. Plaintiff asked what had happened. Spiegel told him about the call, and plaintiff stated he did not know about it.

Defendants argue that plaintiff was clearly in dereliction of critical duties owed to the district and community. They assert that plaintiff's conduct is comparable to that of a police officer suspended for sleeping while on duty. (*Pryka v. Board of Fire & Police Commissioners* (1978), 67 Ill. App. 3d 210.) In *Pryka*, a policeman was found asleep in a patrol car during his shift. The shift supervisor noticed the plaintiff's car in an open field and shined a searchlight on the vehicle from descending distances. The supervisor was next to the driver's side door when plaintiff's head popped up into view, and he brushed his hair back and rubbed his eyes.

Defendants cite two other cases to support their contention: *Green v. Board of Fire & Police Commissioners* (1980), 87 Ill. App. 3d 183 (police officer sleeping on duty and disobeying an order), and *Petraitis v. Board of Fire & Police Commissioners* (1975), 31 Ill. App. 3d 864 (police officer sleeping on duty and arranging for illegal drugs for another person). Neither of these cases or *Pryka* is factually similar to the present case. In each case, the suspended officer was not permitted to sleep on duty and nevertheless did so. Here, plaintiff was on a 24-hour shift and was expected to sleep during part of it, responding to any calls that came in during his period of sleeping.

The issue is not whether plaintiff was sleeping on duty but whether his failure to awaken to the call was an intentional breach of duty. In the above-cited cases, there is no question that the sleeping police officers were intentionally breaching their duty. The evidence shows that at 5:15 a.m., January 10, 1986, plaintiff was sound asleep. The paging device failed to awaken him. Fire fighters Rick and Arnswald responded to the call but made no concerted effort to wake plaintiff up. Both called to plaintiff but did not go over to his bed and physically rouse him, *e.g.*, shake him awake, pull off his covers, etc. Rick admitted to the fire chief that his efforts to awaken plaintiff were inadequate. Plaintiff was never awake during this incident. There is no evidence that somehow, while asleep, plaintiff formed the requisite intent to remain asleep and fail to answer the call. We find that he was never conscious to the point where he was capable of intentionally failing to respond to the call.

Where, as here, sleeping is an inherent part of a job, it is essential that fellow employees on a shift make complete efforts to rouse an employee who has not responded to a call. If, as in the instant

case, such efforts are inadequate, an employee who has slept through a call cannot be found to have intentionally failed to perform his duties.

For reasons stated above, we find that under these circumstances, the Board's decision suspending plaintiff for five days was unreasonable. Therefore, the decision of the circuit court of Lake County affirming plaintiff's suspension is reversed.

Reversed.

LINDBERG, P.J., and UNVERZAGT, J., concur.